## DISTRICT COURT FOR CREEK COUNTY
## STATE OF OKLAHOMA

LARRY HOLLAND, as Special Administrator for the Estate of
Larry Holland, deceased,

        Plaintiff,

v.

Turn Key Health Clinics, LLC, Flint Junod, Jon Echols, Jesse White,
Trent Smith, Dr. William Cooper, Jane Kirby, Nicole Cobb, Kerri Janes,
Nicole Bynum, Jacque Gatticus, Julie Salamy, Julie Hightower,
James Constanzer, Carla Clark, Creek County Public Facilities Authority,
Dick White, Newt Stephens, Topper Causby, Chuck Mitchell,
Tom McGuire, Ky Chaffin, Board of County Commissioners for the County
of Creek, Leon Warner, Lane Whitehouse, Bret Bowling, Joe Thompson,
Fred Clark, Randal Arnold, Roger Auman, Lloyd Blaylock,
Colton Brownfield, Don Caffey, William Campbell, Shaun Charkowski,
Lane Conner, Peter Davis, Samuel Denton, Ashley Garris, Terry Greer,
Lillian Hernandez, Christopher Hinojosa, Jordan Hudson, Sheree Hyde,
Menter Kalevik, Matthew Kramer, Jeffery Labbee, Addie Leatherwood,
Tyler Mast, Kyle Moore, Lance Prout, Tisha Robinson, Earnesto Sellers,
Cody Smith, Kelsey Straley, Jennifer Talley-Pittser, Cynthia Thompson,
Donovan Wakefield, Cory Ward, Kevin Winters,

        Defendants.

Case No.: CJ-2018-35

FILED IN DISTRICT COURT
CREEK COUNTY BRISTOW OK

NOV 26 2019

TIME 3:29

Amanda VanOrsdol, Court Clerk

---

## FIRST AMENDED PETITION

Pursuant to Court Order, Larry Holland, as Special Administrator for the

Estate of Floyd Holland, deceased, for his cause of action against the above-named

Defendants, would state as follows:

## I.

### INTRODUCTION

This is an action for declaratory relief and damages arising from the

operation of a pretrial system of corrections in Creek County, Oklahoma that

fleeced taxpayers by diverting funds to a private medical correctional vendor that

EXHIBIT 54

failed to provide staffing to adequately perform services it contracted to deliver, which systematically deprived individuals like Floyd Holland of their constitutionally protected rights.

As implemented, Creek County contracted with a private company to assume complete responsibility for medical services at the county jail to include: conducting intake medical screenings, responding to sick call requests, performing pills pass in all housing units, and supervising people with potentially life-threatening medical needs. Despite knowledge the vendor contracted to assume total responsibility for these services, Creek County further knew the vendor did not staff the contract sufficient to provide the services within constitutional requirements. Creek County then failed to take action reasonably designed to remedy the deficiency. As a direct result, the medical services contractor received 100% of the contract value paid by taxpayers who did not receive 100% of the services.

Based on prior incidents, Creek County knew the contractor did not provide adequate staff to fulfill the contract, or alternatively, it knew the vendor was not adequately performing the services it contracted to provide. These failures were the moving force behind the inadequate supervision of Floyd Holland and the indifference exhibited towards his life-threatening medical conditions for which the Defendants are liable under 42 U.S.C. § 1983 and corresponding state law.

## II.

### PARTIES, JURISDICTION, VENUE

1.     Larry Holland is the surviving biological son of Floyd Holland, and the Court appointed Special Administrator over Floyd's Estate as set forth in Creek County District Court.

2.     Turn Key Health Clinics, LLC, (Turn Key) is a domestic for-profit corporation, and was the private correctional medical contractor at the Creek County Detention Center (CCDC) during Floyd's stay that is the subject of this lawsuit. At all times relevant hereto, Turn Key, its agents, employees, and members, were independent contractors with Creek County as defined by the Oklahoma Governmental Tort Claims Act (OGTCA). By contracting with Creek County as an independent contractor, Turn Key knowingly and voluntarily waived any protections or immunities it might claim under the OGTCA.

3.     Flint Junod, Jon Echols, Jesse White, and Trent Smith (Turn Key Members), are or were the members of Turn Key at all relevant times with responsibility for promulgating, creating, implementing or possessing personal responsibility for the continued operation of policies that caused the complained of harm.

4.     Dr. William Cooper, Jane Kirby, Nicole Cobb, Kerri Janes, Nicole Bynum, Jacque Gatticus, Julie Salamy, Julie Hightower, James Constanzer, Carla Clark (Turn Key Eemployees), are or were the agents or employees of Turn Key with responsibility for providing Floyd Hollard with adequate on-site medical care

3

at the CCDC, and who further denied or delayed that care causing substantial harm to him and the Estate.

5.     Creek County Governmental Facilities Authority (CCGFA) is a Title 60 trust responsible for the physical plant housing the CCDC. Dick White, Newt Stephens, Topper Causby, Chuck Mitchell, Tom McGuire, Ky Chaffin (Trustees), are or were the Trustees for the CCGFA at all relevant times with responsibility for promulgating, creating, implementing or possessing personal responsibility for the continued operation of policies that caused the complained of harm.

6.     Board of County Commissioners of the County of Creek (Board) is the legislative body for Creek County with the non-delegable duty to provide a jail facility that is adequate for the safekeeping of inmates. Leon Warner, Lane Whitehouse, and Newt Stephens (Commissioners), are or were the county commissioners for Creek County, Oklahoma at all relevant times with responsibility for promulgating, creating, implementing or possessing personal responsibility for the continued operation of policies that caused the complained of harm.

7.     Bret Bowling (Bowling) was the elected Sheriff of Creek County at all relevant times, and along with Joe Thompson, Fred Clark, and Lance Prout (Administration), were either final policymakers for the CCDC, or worked as authorized decisionmakers sufficient to impose entity liability on the county. Bowling and Administration had responsibility for promulgating, creating, implementing or possessing personal responsibility for the continued operation of policies that caused the complained of harm.

4

8.     Randal Arnold, Roger Auman, Lloyd Blaylock, Colton Brownfield, Don Caffey, William Campbell, Shaun Charkowski, Lane Conner, Peter Davis, Samuel Denton, Ashley Garris, Terry Greer, Lillian Hernandez, Christopher Hinojosa, Jordan Hudson, Sheree Hyde, Menter Kalevik, Matthew Kramer, Jeffery Labbee, Addie Leatherwood, Tyler Mast, Kyle Moore, Lance Prout, Tisha Robinson, Earnesto Sellers, Cody Smith, Kelsey Straley, Jennifer Talley-Pittser, Cynthia Thompson, Donovan Wakefield, Cory Ward, Kevin Winters (Staff), are or were staff for the CCSO. Upon information and belief, some or all of Staff had responsibility for providing Floyd Holland with adequate supervision and care consistent with the state and federal constitutions.

9.     Estate brings suit against the individual Defendants in both their individual and official capacities acting under color and authority of state law.

10.     The events complained of herein occurred in Creek County, Oklahoma which is within the territorial jurisdiction of this Court, and the claims arise under federal law, making jurisdiction and venue proper.

11.     Assuming there are any prerequisites to filing suit, Estate has fully and timely complied with all available requirements.

III.

STATEMENT OF FACTS

12.     Estate restates and realleges each of the preceding paragraphs as if fully set forth herein.

5

13.     On August 22, 2017, Floyd was seen at the Claremore Indian Hospital (CIH). His medication list included (1) Albuterol inhaler (broncospasm/COPD); (2) Diltiazem (high blood pressure); (3) Formoterol inhaler (COPD); (4) Mirtazapine (antidepressant); (5) Venlafaxine (antidepressant); (6) Tamsulosin (enlarged prostate); and (7) Flomax (enlarged prostate).

14.     Floyd's medical history at the time included: (1) chronic COPD; (2) major depression; (3) insomnia; (4) microcytic anemia; (5) reflux; (6) benign prostatic hyperplasia; (7) urinary hesitancy; (8) nocturia; and (9) polyuria.

15.     On August XX, 2017, Floyd was arrested for DUI and transported to the CCDC.

16.     Records indicate that Floyd received an intake on August 25, 2017, at 11:21 p.m. That intake noted the following: (1) that Floyd does not appear under the influence; (2) that Floyd was not carrying medications; (3) that Floyd does not have asthma; (4) that Floyd was hospitalized 3 days ago for checkup; (5) that Floyd takes medication for high blood pressure; (6) That Floyd is allergic to a blood pressure medication; (7) that Floyd has been to CCDC before.

17.     Records indicate that Floyd also executed a medical authorization to allow the jail to request Floyd's medical records and history. A notation on the Authorization for disclosure and Release of PHI form indicates the authorization was faxed to CIH on 8/27/2017. There is no indication of any response from CIH.

18.     Records indicate that on August 26, 2017, a medical intake form was prepared by Turn Key nurse Janes. That form acknowledges the following: (1) that

6

Floyd has high blood pressure controlled by medication; (2) that he weighed 160 lbs; (3) that his oxygen saturation was 97%; (4) that Floyd suffered from COPD and emphysema; (5) that Floyd depends on the use of multiple inhalers; and (6) that Floyd takes medication for depression.

19.    The Medical Intake Form incorrectly charts that Floyd does not take medication.

20.    The records include a Medication Administration Record (MAR) that begins on September 2, 2017 to include the following provider orders: (1) Effexor; (2) Diltiazem; (3) Remeron; and (4) Tamsulosin. There is no indication that Floyd was provider either inhaler.

21.    During the detention, records indicate that Floyd fell in the housing unit on or prior to November 9, 2017.

22.    Floyd was diagnosed with muscle sprains and a pain rating of 8/10. He was given an ice pack by a Turn Key LPN who also charted greatly decreased range of motion.

23.    Records indicate that Floyd was started on NSAIDs on November 9, 2017.

23.    Upon information and belief, the fall caused a substantial injury to Floyd's lower back and substantially limited his ability to ambulate within the jail.

24.    Floyd's limited mobility, in combination with his preexisting health condition, made Floyd highly susceptible to life-threatening secondary medical complications, to include pneumonia.

7

25.     Upon information and belief, Floyd's limited mobility was obvious and apparent to everyone he encountered at the CCDC from the time of his fall until his eventual discharge.

25.     Records indicate that on November 15, 2017, Turn Key received a report of x-ray exam on Floyd's lower spine that revealed a compression deformity of the L3.

25.     That same day, a family member drove to the CCDC, provided staff with medication for Floyd, and expressed concern that he was not receiving adequate medical care.

26.     Records indicate that on November 15, 2017, Floyd was also started on a second NSAID, Naproxen, that staff combined with the existing NSAID.

27.     Records indicate that from November 16 through November 23, 2017, Floyd was administered an NSAID twice a day.

28.     On November 24, records indicate Floyd was switched to a different NSAID.

29.     On November 26, records indicate that Floyd's condition was worsening, that his pain was now a 10/10 and that he could not walk at all.

30.     Records from November 26 also indicate that Floyd was given two separate NSAIDs in excess of the daily therapeutic amount.

31.     Upon information and belief, overdosing Floyd on NSAIDs exposed him to a substantial risk of serious harm and directly resulted from inadequate staffing and/or training to supervise and monitor Floyd's condition.

8

32.     Records indicate that on November 27, 2017, Floyd was given a third NSAID, a Tordal injection, which similarly exceeded the therapeutic dose for NSAID and exposed Floyd to a substantial risk of serious harm.

33.     Floyd's condition continued deteriorating in a manner that would be obvious to anyone who encountered him, to include the inability to walk, increased difficulty breathing, reduced hydration, and an inability to ambulate to use the restroom.

34.     Upon information and belief, Floyd was left to urinate on himself which contributed to a decline in his condition that further compromised his breathing.

35.     The Staff and Turn Key Employees responsible for Floyd during this time routinely and systematically disregarded his medical needs, failed to chart or acknowledge his deteriorating condition, affirmatively made his condition worse by refusing to provide his inhalers and by overdosing him on NSAIDs, and upon information and belief, forced him to sit or lay in urine soaked clothing.

36.     Upon information and belief, if any steps were taken in response to Floyd's obviously deteriorating condition, they were grossly disproportionate to the urgent medical need confronting Staff and the Turn Key Employees who continued to watch as Floyd's condition worsened.

37.     Records indicate that on November 30, 2017, Floyd was finally transported from the facility with shortness of breath, but the delay in treatment

was too great to overcome and Floyd eventually succumbed to the illness caused by conditions created by the Defendants.

38.    At all times relevant hereto, the CCDC had a policy to monitor and supervise inmates in medical segregation using a Segregation Activity Record (SAR).

39.    At all times relevant hereto, the CCDC had a policy to require the medical services contractor to follow CCDC policies.

40.    Prior to Floyd's detention, Bowling and the Administration knew that SARs were not being prepared, and they further knew the failure to prepare SARs presented a substantial liability because it reflected indifference to the needs and conditions of those held in isolation.

41.    Upon information and belief, Bowling and the Administration knew that Turn Key and the Turn Key Employees were not routinely monitoring and documenting the medical condition of people held in isolation, and despite that knowledge, failed to take reasonable steps to correct the deficiency.

42.    The failure to adequately staff the medical services contract was the moving force behind the failure to monitor and supervise people held in medical segregation.

43.    In the absence of adequate medical staffing, the failure to adequately train Staff to monitor and supervise people held in medical segregation, and elevate care decisions when necessary, was the moving force behind the failure to monitor and supervise people held in medical segregation.

10

44.     Upon information and belief, the failure to monitor and supervise Floyd's medical condition caused his condition to deteriorate over the course of several weeks and allowed him to deteriorate until his condition was irreversible and fatal.

45.     As a direct and proximate result of the failure to adequately monitor Floyd's medical condition, he experienced extreme suffering and pain caused by the delay in adequately responding to his worsening condition.

46.     At all times relevant hereto, Board and Commissioners had a non-delegable duty to provide a jail that was adequate for the safekeeping of inmates, to include the provision of adequate supervision, training, and medical care.

47.     Upon information and belief, after contracting with Turn Key, Board and Commissioners took no steps to determine whether Turn Key, Turn Key Employees, CCGFA, Trustees, Bowling, Administration, or Staff were providing adequate supervision, training, or medical care for people like Floyd Holland.

48.     Disregarding the duty to determine the adequacy of these constitutionally required services represented a policy of the Board and Commissioners.

49.     The failure to determine the adequacy of supervision, training, and medical care embodied an official policy of indifference for how these constitutionally mandated services are enforced at the CCDC.

50.     This failure by the Board and Commissioners allowed inadequate supervision, training, and medical care to take root at the CCDC which served as the moving force behind the injuries and damages suffered by Floyd Holland.

51.     At all times relevant hereto, CCGFA and the Trustees had a duty to provide operational funding for the CCDC, to include funding for adequate supervision, training, and medical care.

52.     Upon information and belief, the CCGFA and Trustees did not provide adequate funding, and that failure served as a policy of the CCGFA and Trustees.

53.     The failure to provide adequate funding caused Bowling and the Administration to rely on a medical services contractor despite knowledge that contractor was not providing adequate supervision and medical care to people like Floyd Holland.

54.     At all times relevant hereto, and upon information and belief, Bowling and the Administration knew that Turn Key and Turn Key Employees were not supervising and monitoring people in medical segregation using an SAR.

55.     Bowling and the Administration knew that Turn Key contracted to provide 100% of the medical services at the CCDC. Medical services include intakes, medicals screenings, pill pass, sick call, and supervision of inmates in medical segregation.

56.     Bowling and the Administration knew the services provided by Turn Key did not adequately cover 100% of the medical services at the CCDC, and despite this knowledge, Bowling and Administration took no steps to provide

supplemental services to address the deficiencies by Turn Key, nor did they seek to enforce the contract with Turn Key to ensure that Creek County was receiving the full benefit of services under the contract.

57.     The failure to enforce the contract or provide adequate supplement services represented a policy by Bowling and the Administration.

58.     As a direct result of enforcing this policy, Turn Key and the Turn Key Employees routinely failed to provide adequate supervision and monitoring of people like Floyd Holland, which caused his condition to deteriorate until he died.

59.     The failure to monitor and supervise people in medical segregation, and the failure to prepare SARs was longstanding and acknowledged by Bowling by at least May 2017.

60.     By placement of a person in medical segregation, Staff and Turn Key Employees would know the person is at heightened medical risk and requires frequent monitoring to determine if their condition is deteriorating.

61.     Despite Floyd's placement in medical segregation, there is no record of any routine medical checks by Staff or Turn Key Employees, and Floyd's condition deteriorated in fact.

62.     Floyd suffered from an objectively serious medical condition, and Staff and Turn Key Employees knew Floyd was at risk, both from his placement in medical segregation and from his deteriorating physical condition. Staff and Turn Key Employees were also put on notice of Floyd's condition by his family.

63.     Despite this knowledge, no reasonable steps were taken to provide Floyd with his inhalers, to respond to his inability to ambulate, to address his inability to use the restroom, or respond to his shortness of breath, until it was too late.

64.     The delay in addressing Floyd's serious medical condition caused irreversible damage and pain and served as the direct and proximate cause of his injuries and death.

65.     Upon information and belief, the policies and practices detailed in this section were longstanding and known to the Defendants sufficient to serve and standard operating procedure at the CCDC as demonstrated through several prior incidents at the jail, including but not limited to:

- A failure to supervise and provide adequate care to Ronald Garland in June 2017;

- A failure to supervise and provide adequate care to Brenda Sanders in November 2016; and

- A failure to supervise and provide adequate care to Russell Foutch in September 2016.

66.     Upon information and belief, each of these prior incidents provided notice to Board, Commissioners, CCGFA, Trustees, Bowling, and Administration that Turn Key and Turn Key employees were not providing adequate supervision and medical care as required by the medical services contract.

67.   Despite a history of prior tortious incidents directly related to the services provided by Turn Key and Turn Key Employees, and despite knowledge that each incident directly implicated the adequacy of constitutionally required services, Board, Commissioners, CCGFA, Trustees, Bowling, and Administration took no reasonable steps to correct the deficiencies.

68.   As a direct and proximate result, these same deficiencies continued at the CCDC and served as the moving force behind the injuries and damages for which the Defendants are liable.

## IV.

### STATEMENT OF CLAIMS

### 42 U.S.C. § 1983

69.   Estate restates and realleges each of the preceding paragraphs as if fully set forth herein.

70.   The facts detailed above support the reasonable inference that Board, Commissioners, CCGFA, Trustees, Bowling, and Administration deprived Floyd Holland of rights protected by the Fourteenth Amendment to the United States constitution for which these Defendants are liable, to include inadequate supervision and staffing, inadequate training, inadequate funding of deficiencies, and policies that enforced, maintained, and promulgated practices that individually or in combination, served as the moving force behind the deprivations that caused the injuries and damages to Floyd Holland.

71.     The facts detailed above support the reasonable inference that Turn Key and the Turn Key Employees deprived Floyd Holland of rights protected by the Fourteenth Amendment to the United States constitution for which these Defendants are liable, to include inadequate supervision and staffing, inadequate training, and policies that enforced, maintained, and promulgated practices that individually or in combination, served as the moving force behind the deprivations that caused the injuries and damages to Floyd Holland.

72.     The facts detailed above support the reasonable inference that Staff deprived Floyd Holland of rights protected by the Fourteenth Amendment to the United States constitution for which these Defendants are liable, to include deliberate indifference to serious medical needs and inadequate supervision that caused the injuries and damages to Floyd Holland.

## V.

## Relief Requested

Estate respectfully requests the following relief:

A.     Compensatory damages against all Defendants;

B.     Punitive damages against Turn Key, Turn Key Employees and Staff;

C.     Declaratory relief that the policies and practices at the CCDC deprived Floyd of his constitutional rights;

D.     Reasonable costs and attorney's fees;

E.     Any other relief the Court deems just and equitable

**WHEREFORE**, all premises considered, the Estate of Floyd Holland respectfully requests the Court enter judgment against the Defendants and set the matter for a hearing on damages.

Respectfully submitted,

BRYAN & TERRILL

J. Spencer Bryan, OBA #19419
Steven J. Terrill, OBA # 20869
3015 E. Skelly Dr., Suite 400
Tulsa OK 74105
Tele/Fax:     (918) 935-2777
jsbryan@bryanterrill.com
sjterrill@bryanterrill.com

## CERTIFICATE OF SERVICE

On this ___ day of November, I served the foregoing on the following:

Paulina Thompson
9801 N. Broadway Extension
Oklahoma City, OK 73114

Steven J. Terrill

17