IN THE UNITED STATES DISTRICT COURT FOR THE

NORTHERN DISTRICT OF OKLAHOMA


LARRY HOLLAND,                          )
                                        )
                Plaintiff,              )
                                        )
-vs-                                    )  No. 19-CV-663-JFH-JFJ
                                        )
TURN KEY CLINICS, LLC, et al.,          )
                                        )
                Defendant(s).           )



TRANSCRIPT OF TELEPHONIC MOTION HEARING

**BEFORE THE HONORABLE JODI F. JAYNE**

**UNITED STATES MAGISTRATE JUDGE**

DECEMBER 3, 2020









*REPORTED BY:*      *BRIAN P. NEIL, RMR-CRR*
                   *United States Court Reporter*

Ex. 1

1              A P P E A R A N C E S

2

3          **John S. Bryan,** Attorney at Law, Bryan & Terrill Law,
   3015 East Skelly Drive, Suite 400, Tulsa, Oklahoma, 74105,
4  attorney on behalf of the Plaintiff;

5          **Paulina Thompson,** Attorney at Law, Johnson, Hanan &
   Vosler, 9801 North Broadway Ext., Oklahoma City, Oklahoma,
6  73114, attorney on behalf of Defendant Turn Key;

7          **Michael L. Carr,** Attorney at Law, Collins, Zorn &
   Wagner, 429 N.E. 50th Street, 2nd Floor, Oklahoma City,
8  Oklahoma, 73105, attorney on behalf of Defendant Creek County;

9          **Elise M. Horne,** Attorney at Law, Goolsby, Proctor,
   Heffner & Gibbs, 701 North Broadway Avenue, Suite 400, Oklahoma
10  City, Oklahoma, 73102, attorney on behalf of Defendant Lance
   Prout.

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          Thursday, December 3, 2020

2                    *  *  *  *  *

3          **DEPUTY COURT CLERK:**   This is Larry Holland v. Turn

4    Key Health Clinics, LLC, et al., Case No. CV-19-663-JFH-JFJ.

5    Counsel, please enter your appearances.

6          **MR. BRYAN:**   Spencer Bryan on behalf of plaintiff.

7          **MS. THOMPSON:**   Paulina Thompson for Turn Key Health

8    Clinics, LLC, defendant.

9          **MR. CARR:**   This is Mike Carr for Defendant Board of

10   County Commissioners of Creek County, the Creek County Public

11   Facilities Authority, Fred Clark, Joe Thompson, and Bret

12   Bowling.

13         **THE COURT:**   All right.

14         **MS. HORNE:**   Elise Horne for Defendant Prout.  Sorry,

15   Judge.   Elise Horne for Lance Prout.

16         **THE COURT:**   Thank you.   I'm sorry I cut you off.   Is

17   there anyone else?

18         **MR. BRYAN:**   No, Your Honor.

19         **THE COURT:**   All right.   Good morning, everyone.   I

20   want to start by saying that I regret having to strike the last

21   hearing at the last minute.   I was asked to cover criminal that

22   day and I just couldn't fit it all in so I got this reset as

23   soon as I could.

24         I have reviewed all the briefs on both the motions that

25   we're addressing here today.   I'm not going to need a whole lot

1    of argument.  I'm basically just going to launch into my

2    rulings, and then if I have questions as to a particular

3    request, I will ask them as I go along.  I'm going to start

4    with plaintiff's third motion to compel discovery, which is

5    docket 88.  Some of my rulings are going to be specific as to

6    the language of those so I'd like you to have them in front of

7    you.  I'm tracking along in the plaintiff's third motion to

8    compel, starting on page 5, with interrogatory 2.

9         Interrogatory 2, identity of witnesses, is going to be

10   granted in part.  I'm omitting the language "or whom you

11   believe may have knowledge."  I'm omitting the language on the

12   next line "or any fact underlying the subject matter of this

13   action."  And I'm omitting the language in the last -- the next

14   to last sentence "that you believe."  I think those phrases are

15   overly broad and make that too vague.

16        Defendant need only respond to this interrogatory with

17   people it knows have knowledge or claim to have knowledge of

18   the facts alleged in the complaint -- or I guess it's actually

19   an amended petition here.  If there are no corporate employees

20   with personal knowledge of the events and only corporate

21   employees who might testify as a 30(b)(6) witness, then those

22   need not be included in this response.

23        The current reference to medical records is

24   insufficient, and defendant is going to be ordered to list out

25   individuals who interacted with Floyd but not in this broad

1    manner that plaintiff requested.

2         Are there any questions about that ruling as to

3    interrogatory 2?

4              **MS. THOMPSON:**  Your Honor, as to interrogatory 2,

5    defendant had previously supplemented its response and listed

6    all of the individuals who were involved in the care of the

7    decedent, Floyd Holland, and that information was provided to

8    plaintiff almost two years ago.  And just to confirm, the court

9    has ordered to only list those individuals with personal

10   knowledge of the events at issue; is that correct?

11             **THE COURT:**  That's correct.  And I wasn't aware of

12   that supplement.  I apologize for that.  Was that in your

13   response brief?

14             **MS. THOMPSON:**  Yes, Your Honor.

15             **THE COURT:**  Okay.

16             **MR. BRYAN:**  Your Honor, if I -- can I respond to

17   that just briefly.

18             **THE COURT:**  Of course you can, yep.

19             **MR. BRYAN:**  That was just in a letter.  I never

20   received a verified supplemental response.

21             **THE COURT:**  That's what I thought.  I mean, I did

22   see that letter that supplemented in that manner, but I am

23   ruling that that needs to be in a supplemental verified

24   response.  But I do think that list that you provided so far is

25   sufficient.

1          Anything further --

2                   MS. THOMPSON:   Your Honor?

3                   THE COURT:   Yes.

4                   MS. THOMPSON:   Yes.   We have provided that

5     supplemental response in a letter and verification of that

6     response was subsequently provided recently to the plaintiff.

7                   THE COURT:   Okay.   Mr. Bryan, what else do you need

8     on this?

9                   MR. BRYAN:   Nothing further, Your Honor.   I'm ready

10    to proceed with the next one.

11                  THE COURT:   Okay.   As I go through here, if there's

12    something that's really adequately been resolved, feel free to

13    stop me.

14          All right.   Interrogatory No. 6, is there anything I

15    need to know about how this has been supplemented or resolved

16    before I rule?

17                  MR. BRYAN:   Nothing from the plaintiff, Your Honor.

18                  THE COURT:   Ms. Thompson?

19                  MS. THOMPSON:   Nothing, Your Honor.

20                  THE COURT:   All right.

21                  MS. THOMPSON:   Nothing, Your Honor, at this time.

22                  THE COURT:   Thank you.   Okay.   Interrogatory 6 is

23    going to be granted in part.   The court finds four years to be

24    an overly broad time frame and finds two years prior to the

25    incident to be appropriate so the request is granted for the

1    years 2016 and 2017.  I am not going to place any geographic

2    limits on this request.  I find lawsuits in other jurisdictions

3    could be relevant -- or are relevant to the issues of notice

4    and *Monell* liability.  I've looked at this and I think the onus

5    of finding factually relevant cases remains on plaintiff, and I

6    think this is a fair allocation of burden regarding

7    identification of other relevant lawsuits in the two years

8    preceding the incident.

9            Interrogatory No. 6 --

10            **MS. THOMPSON:**  Your Honor?

11            **THE COURT:**  Yes, Ms. Thompson.

12            **MS. THOMPSON:**  If I may make a comment with regard

13    to interrogatory No. 6?

14            **THE COURT:**  You may.

15            **MS. THOMPSON:**  Turn Key has locations in multiple

16    states, not just Oklahoma, of different sizes and different

17    needs.  Is the court's decision covering the entire United

18    States or just the state of Oklahoma?  Because Turn Key's

19    position is that the entire United States is too broad of a

20    geographic limit and too burdensome on Turn Key to search

21    through all those jurisdictions to find any relevant cases to

22    provide to -- what it intends to provide to plaintiff --

23            **THE COURT:**  Why is that --

24            **MS. THOMPSON:**  -- that would be pertaining to

25    Oklahoma only.

1    **THE COURT:**  Tell me why that's overly burdensome and

2    tell me why it's not relevant.   Are you making a relevancy

3    argument or burden only?

4         **MS. THOMPSON:**  Well, Your Honor, I'm making both

5    arguments.   With regard to the relevancy argument, in different

6    jurisdictions and different locations the requirement and the

7    policies and the procedures and the requirements pursuant to

8    the contract with the entities in those jurisdictions may be

9    different and may not directly relate to the issue in this

10   case.

11        In addition, searching through all its prior cases for

12   a period of two years in all of those jurisdictions and all of

13   those different states -- and Turn Key is expanding from those

14   locations in multiple states now and it would be unduly

15   burdensome to ask Turn Key to search through all of those

16   records when they're publicly available to view -- most of

17   those records should be publicly available unless were filed

18   and then withdrawn or some sort of an incident that does not

19   allow for a lawsuit, which would be equally difficult for Turn

20   Key to surmise --

21        **THE COURT:**  How many states?   Ms. Thompson, I'm

22   going to interrupt you.   How many states?

23        **MS. THOMPSON:**  I believe currently it is seven

24   states.   I would have to confirm that by checking my records.

25   But there is Oklahoma, Arkansas, Louisiana, Texas, Kansas, I

1  believe Colorado.  I cannot think of another state at the
2  moment.

3  THE COURT:  Okay.  My ruling's going to stand both
4  as to relevance and as to burden.  I don't think searching
5  through lawsuits against Turn Key in a seven-state area for a
6  period of two years is unduly burdensome.  I would also note
7  that defendant hasn't provided any specific evidence of how
8  long this would take or the type of burden that it would
9  impose.  Even if they did, as I said, I've thought hard about
10  whether that's a fair allocation of work as to past lawsuits
11  and I do think that's fair.  Plaintiff's going to have to do
12  the majority of the work of going through these to try to see
13  if there's anything relevant.  Identifying them by name, case
14  number, and court is not overly burdensome for a two-year
15  period and very likely to lead to relevant information.

16  I also don't think the fact that something happened out
17  of state, I accept plaintiff's argument in his briefs that can
18  still be relevant.  Knowledge of an unconstitutional practice
19  through tortious acts in other states can still create the
20  subjective awareness of a substantial risk of serious harm.  So
21  I understand your arguments and those will be rejected.

22  Interrogatory No. 7 --

23  MS. THOMPSON:  Your Honor?

24  THE COURT:  Yes, Ms. Thompson.

25  MS. THOMPSON:  If I -- I apologize for interrupting

1    you.

2                THE COURT:   That's okay.

3                MS. THOMPSON:   But would this ruling be limited to

4    lawsuits filed, lawsuits only, or --

5                THE COURT:   Yes.

6                MS. THOMPSON:   To clarify, yes --

7                THE COURT:   I view that as -- sorry.  If you have a

8    name -- I'm so sorry, Ms. Thompson.  I talked right over you.

9    That was my fault.  But if you have a name, case number, and

10   court, I perceive that request to be filed lawsuits only.

11        Mr. Bryan, is that your intent?

12               MR. BRYAN:   Yes, Your Honor.

13               THE COURT:   All right.  Does that answer your

14   question, Ms. Thompson?

15               MS. THOMPSON:   Yes, Your Honor.

16               THE COURT:   Thank you.

17        Okay.  Interrogatory No. 7, encounters with decedent,

18   has there been any supplement or further resolution of this

19   interrogatory that I need to know about, Ms. Thompson?

20               MS. THOMPSON:   No, Your Honor.  This interrogatory

21   is too vague and I believe that Turn Key has appropriately

22   objected to this interrogatory as "encounter" is not identified

23   specifically and we have not received any further clarification

24   from the plaintiff as to what "encounter" means.  Is that

25   passing the plaintiff in the hall?  Which would be almost

1    impossible to narrow down.  Was it another lawsuit involving a

2    plaintiff?  Just not clear on what plaintiff is looking for

3    there.

4         THE COURT:  Mr. Bryan, I'm going to let you respond

5    to that with what you're looking for with respect to the word

6    "encounter."

7         MR. BRYAN:  Your Honor, it would be just the content

8    used in the phrase.  If there's some type of engagement between

9    Mr. Floyd -- or Mr. Holland and one of their agents, I would

10   like to know that.

11        MS. THOMPSON:  Our response to that, Your Honor,

12   was -- our actual response to this in our interrogatory is that

13   any encounters with respect to treatment or care of Mr. Floyd

14   are documented in the medical records, and anything that may

15   not be documented with regard to care and treatment would be

16   personal knowledge of each individual treating provider and

17   that would be able to be discovered in depositions of those

18   individual treatment providers.

19        THE COURT:  Okay.  I find that this -- so,

20   Ms. Thompson, have you provided -- you provided reference to

21   the medical records under Rule 33(d); is that right?

22        MS. THOMPSON:  Yes, correct.  And further clarify

23   that anything that the individual providers may remember in

24   addition to what's documented in the medical records from their

25   personal recollections with interaction with Mr. Holland,

1   plaintiff is welcome to discover that additional information by

2   deposing those providers directly which plaintiff has not

3   performed.

4           THE COURT:  Okay.  Interrogatory 7 will be denied.

5   I agree with Ms. Thompson that the court -- the defendants'

6   reference to medical records under Rule 33(d) is sufficient for

7   purposes of identification and description of any encounters as

8   to treatment and care, which are the encounters that I find

9   relevant in this case.  I think plaintiff's request would

10  require Turn Key to essentially nail down the testimony of

11  every medical provider regarding the encounter and try to put

12  that in writing in an interrogatory and I find that overly

13  burdensome for purposes of written discovery.

14          I will say that, Ms. Thompson, if you're aware of other

15  encounters as to treatment and care that are not in the medical

16  records provided, you must respond in narrative form for those.

17          MS. THOMPSON:  Yes, Your Honor.  If Turn Key becomes

18  aware of anything else responsive in that regard, we will

19  supplement.

20          THE COURT:  Okay.  And I do expect there to be some

21  inquiry of employees on duty during the relevant time frames

22  with respect to that.  But other than that, everything that

23  you've done so far with respect to identifying the medical

24  records is adequate.  This relates to, I think, request for

25  admission 7 as well so we'll come back to that at that time.

1     Any questions on the ruling on interrogatory 7,

2  Mr. Bryan?

3          MR. BRYAN:   Nothing from the plaintiff, Your Honor.

4          THE COURT:   All right.   Ms. Thompson?

5          MS. THOMPSON:   Nothing further from defendant.

6          THE COURT:   Okay.   Moving on to request for

7  production 2, this request will be granted but only to the

8  extent that defendant knows what documents it's going to use at

9  this point.   This need not be a comprehensive exhibit list.

10  Any documents known to Turn Key for use in the litigation must

11  be produced as they would under other initial disclosure

12  requirements.   Defendant need not attempt to marshal all

13  documents and evidence yet, but it must produce documents that

14  it knows will be relied on at trial at this time.

15          Request for production 3, investigations, that's going

16  to be granted in part.   I find certain language again to be

17  overbroad.   I'm going to omit language "relate or touch upon"

18  and I'm going to omit language "in any way connected" in the

19  next line.   So this request is going to read:   "All documents

20  which refer to any investigation of the claims or defenses

21  asserted in the pleadings."

22          I'm overruling any state law peer-review privilege for

23  the same reasons articulated in the *Cox v. Glanz* case.   If

24  defendant wants to produce a privilege log in response to this,

25  I will give defendant the opportunity to do that.   But

1   otherwise, this is going to be granted with the limitations

2   that I placed on the language.

3           MS. THOMPSON:   Yes, Your Honor.   The defendant has

4   previously responded that no responsive documents are

5   available.

6           THE COURT:   Can you repeat that, please?  I'm sorry.

7           MS. THOMPSON:   The defendant, Turn Key, has

8   previously responded to plaintiffs that we have performed a

9   diligent search of our records and no responsive documentation

10  is available.

11          THE COURT:   Okay.  Well, that will be granted and

12  you have a duty to supplement, if you find any.

13          MS. THOMPSON:   Yes, Your Honor.

14          THE COURT:   Request No. 4, ESI, the incident and

15  affirmative defenses, again, that's going to be granted in

16  part.  It's going to be limited -- this is just a way the court

17  limits some of this overbroad language -- but I'm just going to

18  start that phrase with the capital "Statements."  I'm going to

19  eliminate the "all documents including but not limited to"

20  language.  I think the appropriate starting place is statements

21  affidavits, e-mails, text messages, and recordings, et cetera,

22  involving the claims or defenses asserted in the pleadings in

23  this case.  I'm going to limit the time frame to this to two

24  years prior to the incident.

25          I find a search of the ESI to be reasonable based

1    particularly on the e-mail that's been presented by plaintiff.

2    Plaintiff has provided an example of an e-mail referencing the

3    cost of inhalers that was one month prior to Floyd's admission

4    to the jail.

5         The parties are directed to confer regarding custodians

6    and search terms.  And, again, this is for only a limited

7    two-year time period prior to the incident, the ESI, or other

8    recordings or any other statements whether they're written or

9    memos.  That's a two-year time frame that they have to be

10   searched.

11        I think there was some dispute in the briefing about

12   whether this extended to staffing and supervision and training

13   documents.  I do not find those to be logically included in

14   this request.  This particular request goes to statements and

15   communications and will be limited to that.  If plaintiff wants

16   staffing and supervision and training documents, plaintiff

17   needs to ask for those by category and certainly knows how to

18   do that.

19        Any questions on request for production 4?

20             **MS. THOMPSON:**  No, Your Honor.

21             **MR. BRYAN:**  Nothing from plaintiff.

22             **THE COURT:**  All right.  Request for production 8;

23   this is selected employee records.  That request is going to be

24   granted.  I don't think it's vague or ambiguous or overly

25   broad.  Plaintiff does not have to request this by specific

1   employee.   Defendant must identify relevant employees from the

2   medical records and produce those employment records.

3         My understanding is there are only 19 pages of medical

4   records and Floyd was only -- I'm sorry -- Mr. Holland was only

5   there for three months so I don't think this is a vague or

6   overly burdensome request.

7               MS. THOMPSON:   Your Honor --

8               THE COURT:   Yes.

9               MS. THOMPSON:   -- just to clarify, that defendant

10  has supplemented with the names of our employees almost two

11  years ago and has recently produced the employee files for

12  those employees to plaintiff.

13              THE COURT:   Okay.   Good.   Then you've already

14  complied with my ruling.

15        Is there anything else that needs to be resolved on

16  that, Mr. Bryan?

17              MR. BRYAN:   No, Your Honor, other than I have not

18  yet confirmed that the documents that they have produced would

19  be consistent with the order.   So with that caveat, they have

20  supplemented but I have not verified it is a complete

21  supplementation.

22              THE COURT:   All right.   Request for production 9,

23  policies.   I want to make sure I understand what Turn Key has

24  produced.   I think I did see a table of contents that may have

25  been in a supplemental production, Ms. Thompson; is that

1   correct?

2           MS. THOMPSON:   That is correct.   And we have

3   produced a table of contents to allow plaintiff's counsel an

4   opportunity to select relevant policies and procedures that

5   they had requested to produce in their entirety.   We do not

6   believe that all of the policies and procedures are relevant to

7   the facts of this case and find that many of them are not

8   relevant and are beyond the scope of discovery.   Plaintiff's

9   counsel has not made arrangements or contacted with that

10  request so far.

11          THE COURT:   You mean plaintiff hasn't identified any

12  of the categories listed in the table of contents and told you

13  what he wants?

14          MS. THOMPSON:   Yes.

15          THE COURT:   Okay.   Mr. Bryan, tell me why this table

16  of contents isn't sufficient at this point.

17          MR. BRYAN:   What I typically find with a table of

18  contents is while it may be a starting point, what happens is

19  these policies when you get them will start cross-referencing

20  other portions of the policy manual that have not been

21  produced, and then it just becomes a never-ending process of

22  requesting this policy that cross-references this policy and

23  you just have no idea how the entire policy manual operates

24  until you have the whole policy manual.   And it's just -- it is

25  a more efficient method of production to look at the policy

1   manual because that's what's governing the facility as a whole,

2   as opposed to doing it in piecemeal fashion and then wondering

3   what other elements of this policy manual are having an impact

4   on these policies that I'm just not aware of.

5           MS. THOMPSON:   Your Honor, I find plaintiff's

6   argument inconsistent with reality.   There's no constant

7   cross-referencing with one policy to the other; they're

8   independent from each other.   Based on the subject that they

9   addressed, each policy is clear in the title in the table of

10   contents.   Such as, for example, the care of pregnant inmates,

11   that is clearly not relevant to this case and I don't see why

12   Mr. Bryan would be requesting that policy, for example.

13   There's no other manuals.   The table of contents clearly

14   provides each and every policy that is contained in the manual.

15   There's no other additional manual that is cross-referenced.

16           In addition -- and I've done this with counsel in other

17   cases and I have offered this up to Mr. Bryan before --

18   somebody from a plaintiff's firm is welcome to meet with

19   counsel for Turn Key, such as myself, and review those policies

20   in person and feel like those that they need are relevant so

21   that way there's no need to go back and review anything again.

22   That could be done in one day and then we would produce the

23   relevant policies to them at that time.

24           THE COURT:   Okay.

25           MS. THOMPSON:   We would object to producing the

1    entire policy manual because in large part it is not relevant

2    to the facts of this case.

3            THE COURT:   Ms. Thompson, has Turn Key produced the

4    entire table of contents or selected portions that Turn Key

5    believes are relevant to this case?

6            MS. THOMPSON:   Turn Key has produced the entire

7    table of contents.

8            THE COURT:   All right.   This request for production,

9    the motion to compel is going to be denied.   Turn Key has

10   produced a table of contents -- an entire table of contents and

11   I find that to be sufficient at this time.

12           Mr. Bryan, you can go through that, ask for the

13   relevant sections.   If you get the relevant sections and they

14   cross-reference a section you don't have, I'm going to let you

15   go to Ms. Thompson at that point, and my guess is she's going

16   to be pretty reasonable about that given that she's given you

17   the entire table of contents.

18           My only concern in these cases is when a defendant is

19   having the opportunity to pick and choose the sections of the

20   policy that they give you the provisions for which I've seen.

21   If they're giving you the entire table of contents, I think

22   that's sufficient at this point.   I think the objection is

23   well-founded that they shouldn't have to produce every

24   irrelevant section of this policy when there are going to be

25   very specific policies that are relevant to this case and most

1 | of them will likely not be relevant at all.

2 |       So the objection that I'm sustaining is the facially

3 | overbroad objection.

4 |       **MR. BRYAN:**   Your Honor, can I make a comment

5 | briefly?

6 |       **THE COURT:**   You may.

7 |       **MR. BRYAN:**   This is -- while Turn Key has tried to

8 | cabin this in the context of simply the policy and procedure

9 | manual, the request is not specifically limited to the policy

10 | and procedure manual.  Turn Key has gotten written guidance

11 | that is separate and distinct from the policy manual, which

12 | includes nursing protocols, which would be highly relevant to

13 | how they handle Floyd Holland; in fact, probably more relevant

14 | even than the policy and procedure manual.  I don't have

15 | anything with respect to nursing protocol or any other written

16 | guidance that would be applicable to how they handle

17 | chronic-care inmates, asthmatics, people that are

18 | inhaler-dependent, anything like that.

19 |       And so limiting this to simply the policy and procedure

20 | manual I think is -- it would be underinclusive of the guidance

21 | that is actually applicable at the facility.  And so I would

22 | ask that to the extent that Turn Key has other written guidance

23 | that exists that would be relevant to these types of issues,

24 | that they do produce a table of contents to the nursing

25 | protocols or provide what other written guidance that they may

1  have that would be specific to these claims.

2      **THE COURT:**  That's a fair argument, Mr. Bryan.  I

3  may have let defendant lead me down a path of couching this

4  totally in terms of the policy because that's kind of how this

5  was briefed.

6      Ms. Thompson, do you have -- have you searched for

7  other written memos or guidelines which are certainly requested

8  in RFP 9, such as nursing protocols, that would be relevant to

9  this case?

10      **MS. THOMPSON:**  Yes, Your Honor.  With regard to the

11  nursing protocols, the nursing protocol that Mr. Bryan is

12  referring to are not policies or procedures relating to conduct

13  of Turn Key or any specific location.  Nursing protocols in

14  that are guidelines for medical treatment of a particular

15  condition that's provided by a medical director.  It is not the

16  same thing as an operative guideline or any policy of conduct

17  so it is not in the same category as request No. 9.

18      There are no other operative policies or procedures in

19  Turn Key except a manual, the table of contents for which has

20  been provided to plaintiff.  Plaintiff has not requested

21  nursing protocols specifically or anywhere in the plaintiff's

22  requests for production.  Because it is Turn Key's position

23  that this nursing protocol did not fall in the category of

24  policies and procedures.  Nursing protocols are specific

25  treatments for certain conditions such as diarrhea, for

1    example, that the treatment steps can be taken by a lower

2    practice nurse, such as an LPN or an RN, without having to

3    consult with a doctor or a physician.

4           So, for example, if diarrhea is observed in an inmate,

5    then those steps that are set out in those protocols can be

6    followed and treatment administered indicated in that protocol

7    without having to consult with a treating provider, such as an

8    LPN or M.D. and those steps do not work, then follow-up with a

9    high-level provider, such as an LPN or M.D., would be made.

10          So that has to do with the treatment and care of the

11   patient, not the operative policies of Turn Key, which in Turn

12   Key's position is a different type of request which was not

13   made by Mr. Bryan --

14          THE COURT:   Okay, Ms. Thompson.  Let me stop you.

15   That's enough on that.

16          These nursing protocols, are they drafted by Turn Key

17   medical -- the Turn Key medical director meaning they're

18   specific to Turn Key?

19          MS. THOMPSON:   Yes.  They're drafted by the treating

20   provider --

21          THE COURT:   Okay.

22          MS. THOMPSON:   -- and --

23          THE COURT:   All right.  Let me ask you something

24   else.

25          MS. THOMPSON:   -- there are different ones in

1    different locations, yes.

2           THE COURT:   If, from your perspective, plaintiff had

3    asked for this correctly -- I understand your argument that

4    this falls outside RFP 9 -- if they had asked for it correctly,

5    are you making a relevance argument that somehow these nursing

6    protocols aren't relevant?  Or would it be a similar argument

7    that you should be able to produce some sort of index or list

8    of those?

9           MS. THOMPSON:   If the plaintiff directly asked for

10   the nursing protocols, I would provide -- I would provide a

11   table of contents.  Because some of those, of course, would not

12   be relevant for the care and treatment provided to Mr. Floyd or

13   his alleged condition.

14          THE COURT:   Okay.  Mr. Bryan, I'm assuming your

15   argument is guidelines, however characterized, encompasses the

16   nurses protocols; is that correct?

17          MR. BRYAN:   Yes, Your Honor.  And I would just add

18   that it's fairly well-established in the Tenth Circuit that any

19   type of written guidance that is utilized in the care and

20   treatment of a particular individual is certainly sufficient to

21   establish some type of subjective knowledge, or deviations from

22   those policies would be able to establish a reasoned inference

23   of deliberate difference.

24          THE COURT:   Okay.  I find that -- I think I

25   previously said RFP 9 was going to be denied because I found

1    what had been currently provided sufficient.  I'm going to

2    revise that ruling and say it's granted in part and denied in

3    part.  It's denied in part, as I previously indicated.  With

4    respect to unproduced nursing protocols that are written, I

5    find those are encompassed within request for production 9's

6    request for guidelines, however characterized, governing

7    operations from August 2017 through November 2017.

8         I'm going to require production of a table of contents

9    of those nursing protocols, I find them relevant, and I'm

10   allowing an initial production of a table of contents for the

11   same reasons that I previously articulated with respect to the

12   policies.

13        Even if I went back and made plaintiff revise this

14   request, somehow I would still reach the same result and we

15   would just be doing the same thing back here again.  So I do

16   find it's encompassed and I find this to be the most efficient

17   way to get those nursing protocols produced in this case.

18        Moving on to request for production 10, which is income

19   statements and budgets for 2015 through 2018, I want to hear

20   from you, Ms. Thompson, quickly about -- I think you cited a

21   holding in the *Sanders* case by Judge McCarthy in relation to

22   Rule 30(b)(6) testimony.  Do you believe Judge McCarthy ruled

23   against another plaintiff on this issue?

24             **MS. THOMPSON:**  I'm sorry.  I did not understand the

25   last portion of your question.

1       THE COURT:   Did -- let me rephrase it.

2           I was trying to find -- in the *Sanders* case, I believe

3    you said Judge McCarthy reached a contrary ruling as to

4    plaintiff's position.   In this case, obviously it's a different

5    case with a different lawyer.   But I want to hear from you,

6    first of all, as to why that's not relevant; and second of all,

7    what you know about Judge McCarthy's ruling in the other case.

8           MS. THOMPSON:   Yes, Your Honor.   In the other case,

9    there were two topics that encompassed financial information,

10   such as profits, budget, and financial condition I believe was

11   the exact request in that case.   And Judge McCarthy found that

12   this is relevant to the claims alleged in that case, which is

13   the same claims delivered in different in the position

14   (inaudible) same claims that more or less in this case.   That

15   was not a motion to dismiss because it was dismissed at the

16   state level.

17          But regarding the 1983 identical claim, Judge McCarthy

18   found that information to be irrelevant and having no provident

19   value as to the filing of deliberate indifference of Turn Key

20   and its employees and denied those topics from consideration.

21          In my argument in response to plaintiff's motion to

22   compel, I found that only to be relevant as to the similar

23   issue in this case.   Because plaintiff is seeking broadly

24   financial information which is confidential, private, and

25   proprietary information of a private corporation which is --

1   the private corporation, such as Turn Key, has a certain right

2   to privacy which is not being infringed in a nonviolent

3   fashion.

4          I do not believe that Mr. Bryan had articulated a

5   sufficient justification for infringing as to those rights to

6   privacy by blocking the request of financial information when

7   it has no probative value to the actual deliberate

8   indifference.  There's no allegation that the financial

9   position or financial decision of Turn Key somehow affected the

10  care of Mr. Holland --

11          THE COURT:  Isn't it relevant -- Ms. Thompson, isn't

12  it relevant to punitive damages?

13          MS. THOMPSON:  Well, it could be relevant to

14  punitive damages, Your Honor.  However, the punitive damages

15  stage has not been reached in this case and it may never be

16  reached.  At this point their motion to dismiss -- several

17  motions to dismiss are still pending in this case and could

18  still be granted.

19          Further, Turn Key denies the allegation of the

20  plaintiff --

21          THE COURT:  Sure.

22          MS. THOMPSON:  -- and they may not be established

23  and we may not ever reach the punitive stage.

24          THE COURT:  I understand that argument.

25  Ms. Thompson, I'm going to stop you.  We just don't know -- I

1   mean, I haven't ever seen a court take a break for discovery

2   and let some more discovery be done on punitives.  That usually

3   proceeds in a rapid fashion so I'm wondering how plaintiff

4   would get this information.

5          Mr. Bryan, I'm going to let you respond to the

6   arguments both as to relevance as to liability or deliberate

7   indifference and punitives.

8          **MR. BRYAN:**  Thank you, Judge.  I think it's fairly

9   straightforward in why the relevance to punitive damages.  They

10  are -- the information is specifically relevant to the degree

11  of, you know, the probability of the misconduct.  It is the

12  traditional punitive damages type of information.

13         **THE COURT:**  And if I were to give it to you now, how

14  would you get it, Mr. Bryan?

15         **MR. BRYAN:**  I -- that's a great question, Your

16  Honor.  I don't know at what point we would take a break as

17  part of the litigation and try to re-engage discovery with

18  respect to punitive damages.  I just don't know.

19         **THE COURT:**  Well, you know and I know that just

20  doesn't happen.  I mean, I've never seen that happen.  But go

21  ahead.

22         **MR. BRYAN:**  Yeah.  And with respect to the

23  substantive issues, I would refer the court to the *Swan* case

24  and the holding in *Swan* matter that we cited in the reply brief

25  and how the *Swan* court addressed how financial information is

1    substantively relevant to allegations where there is specific

2    evidence that would at least support an inference that there

3    was decision-making that was tailored to financial

4    considerations as opposed to medical need.

5         And in this case, we've provided the court with

6    evidence that there was considerations relevant to denying

7    inhalers because of the financial costs associated with that.

8    In addition, we've also provided evidence to the court where

9    this particular practice that we're alleging manifested itself

10   in another jurisdiction that resulted in the death of an inmate

11   prior to the time of Mr. Holland's incarceration.

12        So I think based on the rationale of the *Swan* case, in

13   addition to just the judicial efficiency and for the parties

14   with respect to discovery and punitive damages, I think the

15   information's relevant.  I would add just also there's some

16   allegations related to staffing that would implicate the

17   financial records that we're seeking.

18        **THE COURT:**  If I gave you one year of this,

19   Mr. Bryan, what would be the most important year, 2017?

20        **MR. BRYAN:**  I would probably -- because the incident

21   in Arkansas happened, I believe, at the end of 2016, I think

22   2016 and 2017 would be the most important.  But if we're only

23   doing one year, I would probably request at least the one year

24   prior.

25        **THE COURT:**  All right.  Respectfully I think there's

1   some factual issues in this case that may not have been present

2   in *Sanders* regarding whether financial considerations played a

3   role in some of the medical issues that are at issue here.

4   Again, plaintiff has submitted some evidence -- I know it's

5   just an e-mail -- but plaintiff has submitted some evidence

6   that there's discussion of how much certain things cost and

7   those certain things could have been things that made a

8   difference in the level of medical care that was provided in

9   this case.  So the finances are at issue to at least some small

10  extent and perhaps more than in the *Sanders* case.

11      I also find that some of this information has to be

12  presented as relevant to punitive damages.  There could be

13  later stages of the case or of discovery that this could be

14  appropriate in, but I don't think you would get through the end

15  of discovery and then wait to see whether you got a punitive

16  damages instruction and then try to get this discovery.  That

17  seems like an awfully big risk for plaintiff to take and I find

18  it relevant to the proceedings.

19      I do think that the years requested are overly broad

20  and I don't know -- yeah, I think income statements and budget

21  is appropriate.  I'm going to allow that for the years of 2016

22  and 2017 and it's going to be subject to the protective order.

23      Obviously, if there's specific things -- I can't

24  imagine what it would be, Ms. Thompson, but if there are any

25  specific things that you think are not relevant that need

 1  redacted, I would certainly consider that redaction for privacy

 2  sake, but I think most of it's probably going to be relevant

 3  under my ruling.  So I'm going to require production of that

 4  information for 2016 and 2017 subject to, of course, a

 5  protective order.

 6          Are there any questions about that ruling?

 7          MR. BRYAN:  Nothing from the plaintiff.

 8          MS. THOMPSON:  Nothing from defendant.

 9          THE COURT:  Thank you.  All right.  Let's talk about

10  the request for admissions.  No. 7 was not mentioned in your

11  reply brief.  Is that still at issue?

12          MR. BRYAN:  Yes, Your Honor.

13          THE COURT:  It is.  Okay.  Why are you contending

14  this is vague or hard to admit or deny, Ms. Thompson?  You,

15  being Turn Key, did not provide any medical care or assessment

16  of plaintiff's decedent that is not documented in the medical

17  records from the Creek County Detention Center.

18          MS. THOMPSON:  It's vague whether they're referring

19  to the medical -- medical records from the Creek County

20  Detention Center.  Creek County Detention Center keeps medical

21  records from prior incarcerations of inmates and other inmates

22  that are no longer incarcerated so it is vague as to what

23  specific medical records that they're referring to.  We have no

24  access to the Creek County Detention Center records --

25          THE COURT:  Oh, okay.

1          MS. THOMPSON:  -- of the Turn Key records.

2          THE COURT:  All right.  Mr. Bryan, can you -- what

3    are you asking them for here to admit or deny?  Do you

4    understand what she's saying?

5          MR. BRYAN:  Yeah.  And, I mean, all we're looking

6    for is to get some type of clarity on what the scope of the

7    encounters are, that there are encounters that are outside the

8    records.  You know, they're suggesting in their prior answer to

9    the interrogatory there is not so I'm not sure --

10         THE COURT:  All right.  This request for admission

11   is going to be denied.  I agree with Ms. Thompson and with Turn

12   Key that that last phrase "from the Creek County Detention

13   Center" makes this vague.  On a request for admission, the

14   wording is extremely important and I'm not going to make them

15   answer that.  I do think you have a lot more assurance than you

16   had before you started here today about the individuals

17   involved in the encounter, but the way that's worded I'm going

18   to deny it.

19         Request for admission 8, you did not discipline or

20   reprimand any employee arising from any encounter with Floyd

21   Holland, how is that ambiguous?  The word "encounter," is that

22   your argument, Ms. Thompson, again?

23         MS. THOMPSON:  I mean, yes, the word "encounter" is

24   vague so it is difficult to deny or admit this without knowing

25   what specifically that means.

1      **THE COURT:**  Okay.  I don't think that's vague or

2   difficult to understand.  I also think that whether the

3   encounter was related to medical care or treatment or not, I

4   think that's still relevant and I think you can easily admit or

5   deny that based on the way it's worded.  So the motion to

6   compel, request for admission 8, is going to be granted.  The

7   word "encounter" is given its normal meaning.

8      Okay.  I think that covers plaintiff's third motion to

9   compel.  Anything else we need to address on docket 88 from the

10  plaintiff's perspective?

11     **MR. BRYAN:**  Nothing, Your Honor.

12     **THE COURT:**  Ms. Thompson?

13     **MS. THOMPSON:**  Nothing further from defendant.

14     **THE COURT:**  Okay.  Now we're going to move to

15  plaintiff's second motion to compel which is docket 85.  This

16  requests all documents produced by Turn Key in the *Sanders*

17  case, which is a case pending in this district, for medical

18  negligence resulting in death that was less than one year prior

19  to Mr. Holland's death.

20     Mr. Bryan, I want to hear from you.  I don't have a

21  great sense from the briefs of exactly -- I don't need a long

22  explanation but briefly the facts of each of those cases.  And

23  I know you don't represent the plaintiff in that case, but I

24  need to know what medically is at issue other than, of course,

25  deficient care and treatment but I need to know some more about

1    the facts in the *Sanders* case.   And I also want to hear from

2    you on exactly when each death occurred and whether they were

3    both at the jail when the death occurred.

4         Mr. Bryan, I'm going to start with you.

5              **MR. BRYAN:**   Sure.

6              **THE COURT:**   So I'm trying to establish whether

7    there's -- to sustain or deny the relevance objection here.

8              **MR. BRYAN:**   Sure.   So Brenda Sanders, as the court

9    already acknowledged, happened roughly one year prior to

10   Mr. Holland's incident.   Ms. Sanders, like Mr. Holland, was a

11   chronic-care inmate at the facility.   Mr. Holland's medical

12   condition involved COPD.   Mrs. Brenda Sanders, she -- my

13   understanding is had some type of infection and ended up going

14   septic.   Both of them were housed towards the latter part of

15   their detention within the holding cells, I believe, the

16   segregation holding cells, in the booking area at the facility.

17   Turn Key was the operator in both instances.   The allegations

18   in both cases involve the denial of care.

19         Mrs. Sanders, I don't know if she died at the facility

20   or died shortly thereafter at a hospital.   Mr. Holland died

21   roughly 15 days later at a hospital, but I believe he was on

22   life-support measures almost from the moment that he left the

23   facility and never regained consciousness.

24         I believe the Oklahoma Medical Examiner's Office has

25   identified both deaths happened due to the policies occurring

1   at the jail, and both of them were chronic-care inmates and

2   would be subject to the same types of policies and procedures

3   and same type of operational protocols between the 2016 death

4   and the 2017 death.

5        So because both of them were subjected to basically the

6   same policies in the same location, they were both classified

7   as chronic-care inmates, and they both ended up dying because

8   of what both estates are alleging was inadequate care, we

9   believe it's at least -- our estate should be allowed to at

10  least make the argument that the Sanders death is a

11  sufficiently similar incident for purposes of establishing the

12  county's course of conduct in the *Monell* context.

13       **THE COURT:**  Okay.  I want to talk to you about my

14  concerns about this request in this case and let you address

15  those concerns.

16       These are two ongoing -- as you know, these are both

17  ongoing cases.  I believe Judge Little recently had a hearing.

18  I'm obviously conducting hearings.  There's going to be

19  different relevance rulings particularly as to other incident

20  evidence, I would think.  I might give you four years.  She

21  might give you two years.  I don't know.  I haven't looked.

22       There appears to be some element that's causing me

23  concern about granting you all discovery in another proceeding

24  that's not concluded, that's not an identified universe of

25  documents, and that I don't know what has or hasn't been

1    permitted as relevant particularly in relation to my rulings.

2    I'm not saying that there's not a whole swath of documents that

3    aren't relevant.  I do think there are a lot of relevant

4    documents that have been produced in that case.  I'm not sure

5    if you're asking for them in a way that's appropriate given

6    that these are both ongoing cases.

7             What is your response to those concerns?

8             MR. BRYAN:  Well, the way that the case is being

9    litigated obviously, you know, is going to be different because

10   there are factual differences amongst the two cases.  That's

11   simply the same concern that's going to exist with every case

12   that's out there.  Any similar case is going to be dissimilar

13   in some ways and similar in other ways.

14            But because that information at least has a prima facie

15   determination of relevance in the sense that Turn Key has

16   decided it was at least relevant enough to produce it

17   voluntarily in response to a request, or the court has

18   similarly found it relevant for purposes of production, for us

19   to be able to make a cogent argument about similarity we have

20   to be able to understand both the facts that are similar and

21   the facts that are dissimilar.

22            I think because there is at least an indication that

23   the documents that have been exchanged -- which is, you know,

24   obviously only the documents and have been exchanged, there's

25   at least an indication, either from the court or from Turn Key,

1    that these documents are relevant to what was going on with

2    Brenda Sanders.

3         I do appreciate the idea that there is kind of ongoing

4    litigation and so the scope of what may be relevant -- or

5    responsive, I think, to this particular request could change in

6    the future.  I think to mitigate that concern we would be

7    willing to put a time limit on it as of, you know, a particular

8    date and say that documents produced up until this point, you

9    know, that have already been exchanged would be subject to this

10   particular request.

11        Then in the future, if there were other documents that

12   became available that may be relevant to this particular case,

13   then that could be something that could be revisited down the

14   road.  So at least in terms of addressing the shifting

15   landscape of what is actually being ordered produced, that's, I

16   think, at least one method of trying to get our way --

17             **THE COURT:**  Sure.  What about my concern about, you

18   know, you're getting -- a plaintiff in that sense is getting

19   the best of all words if I give you a bad ruling on other

20   incidents that you don't like, maybe you get a better one in

21   the other case or you get an extra year or, you know, you get a

22   few extra lawsuits?  You're just saying that's a casualty of

23   this is the most efficient way to go about requesting this

24   information from this particular defendant; is that right?

25             **MR. BRYAN:**  That is -- yeah, I think that is one way

1    to look at it.  Maybe another way to parse that is to say,

2    well, you know, to the extent that, you know, this court has

3    placed limitations as to time that may be different than in the

4    other case, that whatever limitation this court is applying

5    would be applied to whatever has been produced previously.

6         So, for example, if Judge Little had ordered the

7    production of four years but this court believes only two years

8    would be relevant based on these facts, that this court's

9    interpretation of what's relevant would control as opposed to

10   whatever Judge Little has ordered in that case.

11        THE COURT:  Yeah.  That's not workable, Mr. Bryan.

12   I mean, that's asking a whole lot of the defendant to -- for

13   purposes of a document response.  So the second plan, I don't

14   think, is tenable.

15        I want to hear from -- yeah, go ahead.

16        MR. BRYAN:  Oh, I had just one other option.

17        THE COURT:  Sure.

18        MR. BRYAN:  The document that Turn Key has produced

19   to the plaintiff in the *Sanders* case without, you know, an

20   order for production that Turn Key had acknowledged, yet we all

21   agree that these are relevant documents for purposes of the

22   allegation, that would be, I guess, another way to kind of

23   address this.

24        THE COURT:  Okay.  Understood.  And I realize these

25   are issues that weren't precisely raised as objections.  These

1    are kind of more my logistic concerns about ordering this type

2    of piggy-back discovery or clone discovery, I think is what the

3    case law calls it.

4        I'm going to turn to you now, Ms. Thompson, because I

5    know you are the attorney in that case that represents Turn

6    Key.  I want to hear from you is there any major category of

7    documents that have been produced that you think are wholly

8    irrelevant here?

9            MS. THOMPSON:  Yes, Your Honor.  Specifically, for

10   example, confidential employee files that have been produced in

11   that case would be completely irrelevant.  None of the

12   employees that are Turn Key care providers that were involved

13   in the care of Ms. Sanders were involved in the care of

14   Mr. Holland.  So that would be confidential --

15           THE COURT:  Sure.

16           MS. THOMPSON:  -- information that has no relevance

17   and would be legally intrusive for plaintiff in this case to

18   obtain that information.

19       In addition, the concern in this case is that neither

20   the plaintiff's counsel nor the plaintiff in this case are

21   subject to the protective ruling in the *Sanders* case.  So

22   anything that is produced that has been produced in that case

23   to the plaintiff in this case Turn Key cannot be guaranteed

24   confidentiality of that information.  That is a serious concern

25   of Turn Key.

1        In addition, there's confidential patient information

2   that has been produced in that case and there's been no medical

3   authorizations that have been provided to plaintiff's counsel

4   or plaintiff in this case that would entitle them to the

5   production of that information.

6        I can understand where given the fact that these

7   incidents occurred in the same jail with the same medical-care

8   provider, there could be some overlap in relevant documents

9   such as maybe policies and procedures or something like that.

10  But the way plaintiff's counsel is seeking the entire file is

11  just impermissibly overbroad and a recipe for violation of

12  privacy and the violation of the protective order, and Turn Key

13  would be at risk to produce information that has absolutely no

14  relevancy to the current litigation, is outside the scope, and

15  way beyond the needs of this case.

16       Plaintiff should be required to produce -- or to

17  request specific documents that plaintiff feels are relevant to

18  this litigation that may have been produced in the *Sanders*

19  case.   I think for the entire file is just extremely overbroad

20  and calls for information that is confidential and has no

21  relevance.

22       In addition, I would like to comment that the facts of

23  these two cases are not the same.   It involved different

24  issues, sure.   The basic allegation of 1983 violations in both

25  lawsuits is the same; however, the underlying facts are not the

1   same.

2            In this case, Mr. Holland had passed away two weeks

3   after being transported to the hospital, and the allegation is

4   that Turn Key had failed to provide him with specific

5   medications, inhalers, which Turn Key denies, of course.

6            But in the *Sanders* case, it was a female that had an

7   underlying issue of cirrhosis of the liver which was not --

8   that information was not provided to Turn Key providers by the

9   inmate and Turn Key providers were not aware of that

10  information, which later on this inmate had collapsed and was

11  transported to the hospital in a critical condition where she

12  had died from sepsis.  There's an allegation that the inmate

13  may have suffered from diarrhea which Turn Key was not aware

14  of.

15           So it's not the same information, not the same facts

16  that underlie this case and the *Sanders* case.  Just the basic

17  allegation of a 1983 violation is not enough to draw a

18  correlation or any kind of relation between the two cases to

19  show that, yes, this is the same and Turn Key is doing this

20  again for the purposes of *Monell*.

21           In addition, which is important, and I agree with the

22  court's concern, that both of these cases are still in the

23  process of litigation and these violations have not been

24  established.  So for the purposes of *Monell*, he's not

25  established a pattern of conduct of prior wrongdoing when prior

1    wrongdoing has not yet been established.  In addition, as I

2    stated in my response to plaintiff's motion to compel, one

3    incident is not enough to establish a pattern.

4         The plaintiff is free to search public records for

5    other cases against Turn Key that may establish that pattern

6    that have already been ruled on by other judges or whatever the

7    case may be.  But if the plaintiff is going to start asking for

8    the entire file like in discovery in every case that Turn Key

9    has ever litigated, where is this going to end?  This is a

10   different slope of dangerous proportion.

11        So these are the concerns that Turn Key has in the

12   case.  If plaintiff believes that there are specific types of

13   documents that are relevant to the litigation in this case,

14   then plaintiff should identify those specific documents and

15   allow defendant to respond to the production of those specific

16   types of documents.  Asking for an entire file is

17   inappropriate.

18        THE COURT:  All right.  Mr. Bryan, are there

19   specific categories you could identify?  I'm really struggling

20   with this being overbroad and kind of the logistics of this.

21   But are they specific categories you can identify within this

22   request if you were to revise this?

23        MR. BRYAN:  Yes.

24        THE COURT:  You understand her concern.  There's

25   going to be employee files -- and I know discovery requests

1   don't have to be perfect.  I understand that.  But if we're

2   getting into entire, you know, swaths of documents and

3   information that's just not relevant and that's confidential,

4   such as employee information, that is likely making your

5   request overbroad.  So could you limit this to categories?

6         **MR. BRYAN:**  We could.  I would also say, though,

7   that the staffing -- one of the allegations in this case

8   specifically relates to staffing and specifically relates to

9   training.  And irrespective of whether the Sanders estate ever

10  even filed a lawsuit, these documents, we would contend, would

11  be relevant to the claims here because one of the ways of

12  establishing *Monell* liability is to show if anything was

13  happening across different individuals.

14        So, I mean, merely because there was different Turn Key

15  employees treating or handling Mr. Holland's case than handling

16  Ms. Sanders' case, that's actually a distinction that, I think,

17  tips in favor of establishing *Monell* liability.  If we can show

18  that these same problems were occurring not just with the

19  Holland employees, but also with the Sanders employees as well,

20  that's certainly an indication that there is some *Monell*

21  considerations that are underlying what is happening to these

22  individuals.

23        **THE COURT:**  And you're saying that would be

24  reflected in their employee files?

25        **MR. BRYAN:**  Yes, Your Honor.  That would -- those

1   employee files would identify the various training these

2   individuals had or didn't have and who was training them, the

3   policies or the protocols that were informing their

4   decision-making when they were coming to the facility.

5       I mean, one of the allegations in this case relates to

6   the contract between Turn Key and the county and that the

7   contract called for a specific number of nursing hours per week

8   that Turn Key was then not providing.  And the consequence of

9   that is not merely, you know, Turn Key saving money on

10  personnel costs, but it has an impact operationally.  Because

11  when you have a short-staffed facility, the nursing staff is

12  overburdened with duties, and the only thing that they can get

13  to are the daily routines such as performing sick-call requests

14  and pill-pass during their shifts.  And so the chronic-care

15  inmates like Mr. Holland and like Ms. Sanders are simply left

16  to languish inside of these cells because the staffing pattern

17  prevents them -- prevents the nursing staff from actually

18  performing the duties that they needed to perform with respect

19  to chronic-care inmates.

20      And so, yeah, there are going to be, you know,

21  different records and different considerations with respect to

22  locations, but as I mentioned, it doesn't matter whether the

23  Sanders estate ever filed a lawsuit at all.  The records that

24  relate to her detention, which I believe was only about 30 or

25  45 days' long, are going to be relevant to the arguments that

1   we intend to make to the court about *Monell* liability and how

2   these two individuals were treated similarly and how their

3   outcomes were similar.

4       What Turn Key is suggesting is that we don't even get

5   to make that argument, that we're not even allowed to -- you

6   know, because this is one incident, we don't, you know, even

7   get the opportunity to argue that one incident and we

8   identified another incident in Arkansas.

9       So while I appreciate some of those concerns about, you

10  know, the personnel records, you know, those individuals'

11  personnel records are going to be kept under a protective order

12  in this case, just as it is in *Sanders*, and they don't have any

13  expectation of privacy that's any different or any greater than

14  it would be in the *Sanders* case than it would be in the Holland

15  case.

16      The issue is trying to identify similarities in how

17  these -- how this staff operated at this facility and what was

18  -- you know, what was guiding their decision-making --

19          **THE COURT:**  Okay.  I appreciate your arguments,

20  Mr. Bryan.  I think I've heard enough from both of you on this

21  issue.  Again, I appreciate your briefing.  It was helpful and

22  good.

23      I'm going to take this motion under advisement.  I will

24  either do a short written order or set up another phone hearing

25  to give you a ruling on this second motion to compel.  I want

1   to look at some law.  Neither one of you really cited any cases

2   specific to this what I call piggy-back or clone discovery, and

3   I want to see if I can find anything in the Tenth Circuit that

4   tells the court the standard to apply or how to go about that

5   analysis.

6       I will tell you that I do think a whole lot of these

7   documents that you're asking for are going to be relevant.

8   Whether you get them in this request or whether you have to

9   draft another request that's more specific, I do think they're

10  relevant.  I don't think the fact that it's only one incident

11  is going to prevent plaintiff from getting this information and

12  getting some of these documents.  Obviously, one might lead to

13  two, one might be three, and this is just one piece of the

14  puzzle.  In proving *Monell* liability, he doesn't have to show

15  ten of them to get this particular case.

16      But I do want to look at some of the logistics that

17  come into play with this -- with this type of a discovery

18  request, I want to make sure I understand the facts of *Sanders*,

19  and I want to look at some of the rulings in that case a little

20  more closely.

21      The issue to me is just really whether this is the

22  right way to go about getting this information.  I know I did

23  already deny -- or grant -- I'm sorry -- a motion to quash

24  because we decided the third party was not the correct way to

25  go about it and so plaintiff did it this way.  Now I'm deciding

1    whether this request is overbroad essentially.  So with that,

2    again, expect either a short written order or another phone

3    conference to give you an oral ruling on that issue.

4             Is there anything further from the plaintiff?

5             MR. BRYAN:   Nothing from the plaintiff, Your Honor.

6             THE COURT:   Anything further --

7             MS. HORNE:   Nothing further from defendant.

8             THE COURT:   -- Ms. Thompson?

9             MS. THOMPSON:   I was just going to say nothing

10   further from defendant either, Judge.

11            THE COURT:   Okay.  Thank you.  Thank you all for

12   your arguments today.  They've been very helpful.  Have a great

13   day.

14            MR. BRYAN:   Thank you, Judge.

15                  *(The proceedings were concluded)*

16

17

18

19

20

21

22

23

24

25

*C E R T I F I C A T E*

        I, Brian P. Neil, a Certified Court Reporter for the
Northern District of Oklahoma, do hereby certify that the
foregoing is a true and accurate transcription of my
stenographic notes and is a true record of the proceedings held
in above-captioned case.

        I further certify that I am not employed by or related
to any party to this action by blood or marriage and that I am
in no way interested in the outcome of this matter.

        In witness whereof, I have hereunto set my hand this
28th day of December 2020.


                              s/ Brian P. Neil
                    _____
                       *Brian P. Neil, RMR-CRR*
                       *United States Court Reporter*

*Brian P. Neil, RMR-CRR*
*U.S. District Court - NDOK*